Filed 5/18/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CRESCENT TRUST,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>      Defendant and Respondent. | A162465<br><br>(Alameda County Super. Ct. No. RG20068131)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 23, 2023, be modified as follows:

1. On page 24:  The second sentence in the second paragraph that reads, "And, as we have discussed, this was wholly consistent with the law then, and now, that multiple, separately described lots can be transferred by way of a single conveyance, such as a grant deed." shall be modified to read, "And, as we have discussed, further legal research discloses that this was wholly consistent with the law then, and now, that multiple, separately described lots can be transferred by way of a single conveyance, such as a grant deed."

1

2. On pages 24-25, the last sentence of the second paragraph should be modified to read as follows, "Indeed, in not one of these early cases did the Supreme Court remotely suggest the properties in question had not been legally subdivided because the multiple, separately identified lots, as depicted on a subdivision map, had been conveyed in a single deed."
There is no change to footnote 24.

3. On page 25, the first sentence of the third paragraph should be modified to read as follows:  "The ability of owners to use and sell their property as they desired, including dividing their property into smaller lots, is also reflected by cases decided during that early time period."

4. On page 26:  The following two paragraphs should be inserted after the paragraph that begins, "Accordingly, that commencing in 1885 . . . .":

"In its petition for rehearing, the city maintains this conclusion confuses the principle that property may be "adequately described" in a deed by reference to an antiquated map, and the act of "subdividing."  It asserts that references to multiple lots depicted in a subdivision map has been, and continues to be, merely a shorthand way of describing property *as a whole*, without having to go to the trouble of a metes and bounds description.  Thus, the city seems to be suggesting that if the conveyances in this case had separately described the lots by reference to the Map of San Antonio *and* included separate metes and bounds descriptions for each of the lots, the property would have been "subdivided."  The city cites no authority for this

view. Instead, it cites again to *Gardner*, pointing out the high court commented that cases such as *McCullough* "merely recognized" that a deed description is not inadequate if the property is described by reference to a readily obtainable subdivision map, even an antiquated map. (*Gardner, supra,* 29 Cal.4th at p. 1001.) As we have discussed, however, this comment was made in the course of rejecting the plaintiffs' argument that the mere preparation and filing of an ostensible subdivision map gave legal life to the depicted lots. Indeed, *McCullough* provided no support for that assertion, and it is not an assertion appellant makes here.

The city similarly asserts in its petition that there is no evidence any grantor "intended" to "subdivide" the property by separately identifying the lots as depicted in the Map of San Antonio, pointing out these grantors are long deceased. This is another way of saying that the fact these grantors separately identified the lots by reference to the subdivision map had no significance. This would mean that even the original grantor, who commissioned the map and filed it with the city, could not be said to have "intended" to subdivide the property when he conveyed multiple, separately described lots to various grantees. Furthermore, the city acknowledges that many of the lots and the infrastructure depicted on the map were developed. Thus, the separate lot designations in the conveyances here do not reflect mere theoretical imagining. The city cites no authority suggesting that in these circumstances we must embrace a presumption that a grantor who conveyed multiple separately described lots by reference to a subdivision map that engendered significant development, did not intend to convey separate lots, but only an undivided whole. The city is also essentially saying that, upon conveyance, the multiple separately described lots merged into a single whole since, according to the city, separately describing the lots by reference

3

to the subdivision map had no significance. However, even under the Subdivision Map Act, parcels subdivided "under a prior law, or prior to the regulation of subdivisions, such that they were legal when created, remain separate parcels and do not merge merely because they are held in common ownership." (7 Miller & Starr, Cal. Real Estate (4th ed. 2022) § 20:44; see *Lakeview Meadows, supra,* 27 Cal.App.4th at pp. 597–600.)"

5.  On page 26, the sentence that reads, "Moreover, no case, early or recent, holds the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a) cannot apply in the particular circumstances presented by this case" shall be modified to read: "No case, early or recent, holds the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a) cannot apply in the particular circumstances presented by this case."

6.  On pages 27-28, a paragraph should be inserted after the paragraph beginning "The city also maintains that applying . . . ." and right before the "**DISPOSITION**", which reads as follows:

"In its petition for rehearing, the city also predicts cities will be flooded with requests for certificates of compliance for "illegal" lots and city staff will have an impossible time applying the "fewer than five" presumption of legality. To begin with, we have decided this case on the basis of the specific record before us. The city also acknowledges that recognizing that a lot was legally created is not a green light for unfettered development. (See *Gardner, supra,* 29 Cal.4th at p. 1005 ["recognition of a subdivision through a certificate of compliance does not confer any right to develop the resulting parcels"].) At bottom, the city's argument boils down to the assertion it has

4

made all along—that the only means by which a lot depicted in an antiquated map could be legally created was by a singular conveyance of that individual lot.  While that would, indeed, be a simple rule, it is not one required by *Gardner* or supported by the circumstances here."

There is no change in the judgment.

The petition for rehearing is denied.

Dated: _____

Margulies, Acting P. J.

Filed 3/23/23; Certified for Publication 4/20/23 (order attached) (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CRESCENT TRUST,<br><br>   Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>   Defendant and Respondent. | A162465<br><br>(Alameda County<br>Super. Ct. No.<br>RG20068131) |

  This is an appeal from the denial of a petition for writ of mandate to compel the City of Oakland to issue a certificate of compliance for a single lot, known as lot 18, under the Subdivision Map Act.[1]  We reverse with directions to grant the petition and issue an appropriate writ.

## BACKGROUND

  Lot 18 has its origins in the Map of San Antonio (Map) which was prepared by surveyors and filed with the Alameda County Recorder's Office in 1854 and later recorded in 1869.[2]  The Map depicts numerous "blocks" that, in turn, are divided into numerous "lots."  Many of these lots were soon

---

  [1]  Government Code section 66410 et seq.

  [2]  The land holding was originally part of the San Antonio Rancho acquired by the Peralta family.

1

conveyed to numerous grantees. One of the blocks, block 66, was retained by the owner. This block includes lots 15, 16, 17, and 18.

In 1877, these four lots were conveyed in conjunction with lots 10 through 14 through a probate proceeding, as were numerous other lots in other blocks. The nine lots were separately identified, as were all the other lots conveyed at that time, by reference to the Map.[3]

In 1881, lots 10 through 18, along with numerous other lots in numerous other blocks, were transferred to a bank as part of a financing arrangement.[4]

In 1885, the bank conveyed lots 15, 16, 17, and 18 to an individual grantee, by way of a single conveyance.[5]

In 1887, this individual grantee conveyed the four lots, again by way of a single conveyance, to a new grantee.[6]

In 1913, the lots were again conveyed by way of a single deed.[7]

---

[3] The nine lots were listed in the probate document and described as follows: "42nd. Lots 10 to 18 inclusive in Block 66."

[4] The lots were listed in the financing document and described as follows: "Lots nos. <10 to 18> ten to eighteen, inclusive, in Block sixty-six <66>."

[5] The lots were described, as best as can be discerned from the copy of the handwritten deed in the record, as follows: ". . . in the City of Oakland, County of Alameda, State of California . . . Lots Nos. Fifteen, Sixteen, Seventeen, and Eighteen <15, 16, 17, and 18> in Block No. Sixty-Six <66> of what was formerly the . . . San Antonio . . . recorded in the Recorder's Office of said County of Alameda in . . . of maps at pages 2 and 3."

[6] The lots were described as follows: "Lots Fifteen, Sixteen, Seventeen, and Eighteen (15, 16, 17, and 18) in Block No. Sixty Six (66) of what was formerly the Town of San Antonio as per Map thereof," followed by a mete and bounds description that encompassed all four lots.

[7] The description of the lots on the copy of the deed in the record is illegible.

Nearly 20 years later, in 1932, lots 17 and 18 were, in a single deed, conveyed to another grantee. This transaction was challenged in a probate proceeding, resulting in a 1933 judgment that apparently invalidated the transaction and, in any case, adjusted the boundaries of several of the four lots. Lot 18, however, remained as depicted on the 1854 Map.

In 1944, lots 17 and 18 and a portion of lot 16 were, in a single deed, conveyed to a grantee.[8]

Appellant eventually acquired this property in 2015, that is, lots 17 and 18 and part of lot 16, again by way of a single deed.[9]

---

[8] The property was described as follows:

"BEGINNING at the point of intersection of the south eastern line of 22nd Avenue, formerly Peralta Street, as said Peralta Street is shown on the map hereinafter referred to, with the Southwestern line of East 21st Street; running thence Southeasternly along said line of East 21st street 62 feet; thence at right angles Southwesterly 140 feet; thence at right angles Northwesterly 62 feet to said Southwesterly line of 22nd Avenue; thence Northwesterly thereon 140 feet to the point of beginning.

"BEING a portion of Lot Numbered 16, and all of Lots Numbered 17 and 18 in Block Numbered 66, as said lots and block are delineated and so designated upon that certain map entitled 'Map of San Antonio,' filed September 12, 1854 and recorded April 27[,] 1869 in book 1 of maps at pages 2 and 3 in the office of the County Recorder of Alameda County."

[9] A title insurance policy issued for the property in 2019 set forth the "legal description" (capitalization omitted) as follows:

"BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTH EASTERN LINE OF 22ND AVENUE, FORMERLY PERALTA STREET, AS SAID PERALTA STREET IS SHOWN ON THE MAP HEREINAFTER REFERRED TO, WITH THE SOUTHWESTERN LINE EAST 21ST STREET; RUNNING THENCE SOUTHEASTERN ALONG SAID LINE OF EAST 21ST 62 FEET THENCE AT RIGHT ANGLES SOUTHWESTERLY 140 FEET THENCE AT RIGHT ANGLES NORTHWESTERLY 62 FEET TO SAID SOUTHWESTERLY

3

Appellant subsequently applied for a certificate of compliance for lot 18. In its application, appellant made the following statements: "[L]ots were created pursuant to the 'Map of San Antonio,' filed in Book 1 of Maps at Page 2." "These are legal lots that were created under the applicable rules in effect at the time the Map of San Antonio was filed." "The lots" have since "been improved pursuant to the map" and "streets accepted, and the improvements [] constructed pursuant to the map." Appellant asked "that a certificate of compliance be issued, unconditionally, as Lot 18, Block 66 was legally created and has never had a building over its lot line, which would have merged the parcel."

The city surveyor agreed lot 18 "was legally created by conveyance in accordance with the original said map," observing that the "first labeled indenture" of lots "15, 16, 17 and 18 per 1M2" was by way of the 1885 deed "in 280 D 284." The surveyor concluded, however, that lots "18 and 17, and a portion of 15 and 16 were merged" by the 1933 probate judgment because "[t]he adjudicated lines of the original lots were removed per judgment by metes and bounds description," and thereafter lots "18, 17 and a portion of Lot 16 were effectively merged and resubdivided" by their conveyance in 1944. Since then, there had "been no effort to divide the parcel into the

---

LINE OF 22ND AVENUE, THENCE NORTHEASTERLY THEREON 140 FEET TO THE POINT OF BEGINNING.

"BEING A PORTION OF LOT NUMBERED 16, AND ALL OF LOTS 17 AND 18 IN BLOCK NUMBERED 66, AS SAID LOTS AND BLOCK ARE DELINEATED AND SO DESIGNATED UPON THAT CERTAIN MAP ENTITLED 'MAP OF SAN ANTONIO' FILED SEPTEMBER 12, 1854 AND RECORDED APRIL 27, 1869 IN BOOK 1 OF MAPS AT PAGES 2 AND 3 IN THE OFFICE OF THE COUNTY RECORDER OF ALAMEDA COUNTY.

"APN: 021-0252-022."

4

original 25 foot configurations," "[n]o separately assessed parcel exist[s] for [lot] 18 as of 1972," and the lot had not been "separately" sold or conveyed. In sum, the city "deem[ed] the [lots] effectively merged since 1944."

Appellant responded, stating it did "not wish to merge" the lots and "view[ed] these as legally created."

The city surveyor replied that he "never said [the lots] were not legally created," but said they "are not in the same configuration as they were <u>when they were </u>legally created." "Regarding . . . merger," the surveyor stated appellant "ha[d] no choice as the [lots] are now legally merged" into a single parcel.

Appellant attempted to file an appeal with the city planning commission but was told by the city zoning manager there was no administrative appeal from the denial of an application for a certificate of compliance, and any legal recourse required a court action.

Disagreeing that lot 18 had been lost through merger, appellant filed the instant writ proceeding. In its petition, appellant described the origin of the lot as follows: "On September 1, 1854, multiple lots were recorded as part of the 'Map of San Antoni[o],' filed in Book 1 of Maps at Page 2, Alameda County Records. Individual lots were thereafter transferred to other owners through sales, gifts, and as part of estates. Ultimately, [appellant] became the owner of lots 17, 18, and portions of lot 15 and 16. [Appellant] requested a Certificate of Compliance for Lot 18 only." In short, appellant proceeded on the assumption lot 18 had been legally created and the city was in error with respect to merger.

In its supporting memorandum of points and authorities, appellant identified two ways in which "parcels" (used here interchangeably with the term "lots") created prior to 1972 can be deemed legally created for purposes

5

of the Subdivision Map Act. One way, as appellant characterized it, is through the Act's "compliance" provision set forth in Government Code section 66499.30.[10] This, said appellant, "allows a historic subdivision of land to be considered compliant if the division was done by the recording of a compliant map, regardless of the size of the subdivision," a "compliant map" being one that complied with "a law [that] 'substantively' regulate[d] the design and improvement of subdivisions." Appellant acknowledged "the Map of San Antonio that originally described Lot 18 . . . [did] not qualify for the Compliance Provision because no subdivision law was in effect in California in 1854" when the Map was recorded.[11]

The other way, as appellant characterized it, is through the Subdivision Map Act's "Small Subdivision Provision" set forth in section 66412.6, subdivision (a). This provision applies, as described by appellant, where (a) there "was a division" of land prior to 1972, (b) the division resulted in "the creation of fewer than five parcels," and (c) at the time of the division, there was no local ordinance regulating subdivisions resulting in fewer than five parcels. Appellant asserted this provision applied because "Lot 18 was conveyed in groups of fewer than five lots in 1887, 1913, 1932, and 1933"[12] and "any of these conveyances would have been sufficient to subdivide the

---

[10] All further statutory references are to the Government Code unless otherwise indicated.

[11] As we shall discuss, this statement implicitly acknowledged our Supreme Court's decision in *Gardner v. County of Sonoma* (2003) 29 Cal.4th 990 (*Gardner*) and this court's decision in *Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543 (*Witt*).

[12] As we have recited, lot 18 was first conveyed with only lots 15, 16, and 17 in 1885 by a bank to an individual grantee.

6

property" as there was no local ordinance regulating divisions resulting in fewer than five parcels during that period of time.

Following this general discussion, appellant turned to the issue of merger. It supplied a copy of the 1933 judgment showing it was issued in connection with a quiet title claim following a bench trial. Appellant maintained the judgment preserved the "status quo by granting lots 17 and 18 as distinct lots, along with 'portions of' lots 15 and 16. . . . The judgment stated the description in its then-current form, using [both] a metes and bounds description, and a lot and block description." It did "not include any language about merger."

The city opposed the writ petition—but not on the ground lot 18 had been lost through merger. Rather, the city changed course and now asserted lot 18 "was never lawfully created" because it was depicted on an "antiquated subdivision map" and had not been conveyed as a "separate" lot, citing *Gardner,* which it maintained was "dispositive."

In reply, appellant emphasized it was not relying on either the filing or recording of the Map, in and of itself, as having created the lot. Rather, it was relying on the *conveyances* that transferred only lots 15, 16, 17 and 18 through at least 1933—all of which, according to appellant, resulted in lot 18 being presumptively legal for Subdivision Map Act purposes pursuant to section 66412.6, subdivision (a). The fact the lot was not individually conveyed, but was conveyed in conjunction with three other lots, was, according to appellant, immaterial. These deeds separately identified the four lots, and thus, according to appellant, effectuated a division of the property. Appellant asserted *Gardner* was not only factually distinguishable, but the Supreme Court expressly stated it was not considering section 66412.6, subdivision (a).

7

After hearing argument by the parties, the trial court denied the writ petition in a judgment stating only that "the arguments raised [by the city] are dispositive, and that controlling legal authority prohibits [the city] from issuing a certificate of compliance for Lot 18."

## DISCUSSION

Given the parties' articulated positions, the issue before us boils down to the following—since lot 18 was conveyed in conjunction with three or fewer other lots prior to the enactment of any local ordinance governing such subdivisions, is the lot presumptively legal for purposes of the Subdivision Map Act pursuant to section 66412.6, subdivision (a).[13]  In other words, we are not concerned with whether the filing and recording of the Map, itself, created legal parcels for purposes of the Subdivision Map Act, as appellant has acknowledged it did not.  Nor are we concerned with whether lot 18 was ever "merged" into the adjoining lots, as the city has never made any effort, in either the trial court or on appeal, to justify its denial of a certificate of compliance on that basis.[14]

### *The Statutory Language*

Section 66412.6, subdivision (a) provides:

"For purposes of this division or of a local ordinance enacted pursuant thereto, any parcel created prior to March 4, 1972, shall be conclusively presumed to have been lawfully created if the parcel resulted from a

---

[13]  The parties agree this is a legal question and our standard of review is de novo.

[14]  The city has thus doubly forfeited any such contention.  (See *Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1509 [by failing to provide analysis or authority in support of alternative ground to affirm, respondent "waived" the point]; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues waived [or forfeited]."].)

8

division of land in which fewer than five parcels were created and if at the time of the creation of the parcel, there was no local ordinance in effect which regulated divisions of land creating fewer than five parcels."[15]

This section was added to the Subdivision Map Act in 1980 by way of Assembly Bill No. 978 (1979–1980 Reg. Sess.). (Stats. 1980, ch. 403, § 1.) The legislation "create[d] a conclusive presumption" that a parcel was "lawfully created if such parcel resulted from a division of land into fewer than [five] parcels prior to March 4, 1972, and if at such time there was no local ordinance in effect which regulated divisions of land creating fewer than five parcels." (Sen. Dem. Caucus Report, Assem. Bill No. 978 (1979–1980 Reg. Sess.) as amended May 22, 1980, p. 1.)[16]

The Assembly Floor Vote Analysis explained, "Prior to the enactment [in 1972] of provisions dealing with parcel maps (subdivisions of less than five parcels), it was possible to legally divide land without going through the Subdivision Map Act. . . . [While] parcel maps were not required [by the Act], . . . local ordinance could provide for such a requirement. Confusion has arisen over the legality of parcels created prior to March 4, 1972, where there was no local ordinance." (Positions of Assem. Floor Vote Analysis, Assem. Bill No. 978 (1979–1980 Reg. Sess.) as amended May 22, 1980, p. 2.)

---

[15] Subdivision (b) provides a similar presumption for bona fide purchases, stating in pertinent part: "For purposes of this division or of a local ordinance enacted pursuant thereto, any parcel created prior to March 4, 1972, shall be conclusively presumed to have been lawfully created if any subsequent purchaser acquired that parcel for valuable consideration without actual or constructive knowledge of a violation of this division or the local ordinance." (§ 66412.6, subd. (b).)

[16] We take judicial notice of the legislative history on our own motion. (Evid. Code, §§ 452, subds. (a), (c), 459.)

9

The Enrolled Bill Report prepared by the Department of Real Estate similarly stated, "Current law requires that local government under certain circumstances deny a development permit for any property illegally subdivided. This bill would establish a conclusive presumption that any parcel created prior to March 4, 1972, is legal if: (1) the parcel resulted from a subdivision of fewer than five parcels; and (2) if, at the time of the creation of the parcel, there was no local ordinance regulating divisions of land creating fewer than five parcels." (Enrolled Bill Report, Dept. of Real Estate, Assem. Bill No. 978 (1979–1980 Reg. Sess.) p. 1.) In short, the bill would "limit the power of local government to deny development permits . . . for parcels created by an illegal subdivision prior to March 4, 1972." (*Id.* at p. 2.)

In 1988, section 66412.6 was amended to address a problem that had arisen in Southern California, where subdivisions of fewer than five parcels had been approved prior to March 4, 1972, pursuant to local ordinance, but were being developed after that date. (Sen. Housing & Urban Affairs Com. Report., Sen. Bill No. 1857 (1987–1988 Reg. Sess.) as amended May 2, 1988, pp. 2–3.) Because section 66412.6, at the time, referred only to the situation where "there was no local ordinance" in effect, some local planning officials were taking the position that the statutory presumption of legality did not apply where there was a local ordinance in effect. Thus, subdivisions of fewer than five parcels that had previously been approved pursuant to local ordinance were, after March 4, 1972, being issued only conditional certificates of compliance that imposed new regulatory requirements. (Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 1857 (1987–1988 Reg. Sess.) as amended May 9, 1988, p. 2.)

The amendment provided that parcels created prior to March 4, 1972, pursuant to local ordinance were also presumed to be lawfully created. (Sen.

10

Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 1857 (1987–1988 Reg. Sess.) as amended Aug. 10. 1988, p. 1 ["[t]his bill establishes a presumption that property is legally subdivided if it meets local ordinances existing at that time"].) Furthermore, this new presumption—based on compliance with a local ordinance—applied regardless of the size of the subdivision. (*Id*. at p. 3 ["This measure expands the existing presumption of a lawful division of land from 4 parcels to any number of parcels created prior to March 4, 1972 in compliance with a local ordinance."]; Enrolled Bill Report, Off. of Local Government Affairs, Sen. Bill No. 1857 (1987–1988 Reg. Sess.) as amended Aug. 10, 1985, p. 3 [expansion to any number of parcels accommodated Los Angeles planning officials' desire "to avoid [having to make] a determination as to whether lots created by a [local approval] were created from a division of five or fewer parcels"].)

The 1988 amendment also included a sunset provision. Accordingly, the Legislature revisited section 66412.6 during the 1993 session. (Sen. Bill No. 121 (1993–1994 Reg. Sess.) as introduced Jan. 25, 1993, pp. 1–2.) The upshot was that the expanded presumption of validity for all pre-1972 parcels created in compliance with local ordinances was allowed to expire and the presumption pertaining to "fewer than five" parcels returned, as of 1995, to its original form and as it currently exists.

It is undisputed that in 1885 when lot 18 was first conveyed as one of four separately identified lots there was no law—state or local—regulating divisions of land creating fewer than five parcels. It is also undisputed there was no such law in 1887, 1913, 1932 and 1933, when lot 18 continued to be conveyed in conjunction with all or some of lots 15, 16 and 17. Although the earliest version of the Subdivision Map Act was enacted in 1893, it did not, during any of these time periods, apply to subdivisions resulting in "fewer

11

than five" parcels.  (See generally *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 563, 565–566.)  The earliest local regulation that arguably applied to such subdivisions was adopted in 1939.[17]

### *The Relevant Case Law*

The parties have cited, and we are aware of, only two cases that have discussed the "fewer than five" presumption of legality set forth in section 66412.6, subdivision (a) in any remotely similar context.

The first is *Lakeview Meadows Ranch v. County of Santa Clara* (1994) 27 Cal.App.4th 593 (*Lakeview*).  The plaintiff in that case acquired title "to thousands of acres of ranchland." (*Id.* at p. 596.)  The case concerned three parcels included within the acreage but not "separately described" in the deed. (*Ibid.*)  One of the parcels had been created in 1882 by a deed from one individual to another.  Another was originally part of a patent to Southern Pacific Railroad and created in 1892 when Southern Pacific deeded it to an individual. (*Ibid.*)  The third was created in 1891 by a federal patent to Southern Pacific that described the parcel by reference to a federal survey map. (*Ibid.*)  The federal patent conveyed not only this third parcel, but numerous other, noncontiguous, parcels. (*Id.* at p. 597.)  The plaintiff applied

---

[17] Because the pre-1972 versions of the Map Act defined "subdivision" to exclude subdivisions of "fewer than five" parcels within a given assessment period, this gave rise to a practice referred to as "quartering."  A parcel would be subdivided into four parcels, and these four parcels would, in turn, each be divided into four more parcels prior to the preparation of the next assessor's map.  Even after the Act was expanded to require parcel maps for subdivisions of "fewer than five" parcels, some subdividers attempted to evade the Act's more rigorous tentative and final mapping requirements by "quartering."  The courts quickly prohibited such efforts to avoid the Act's mapping requirements.  (See, e.g., *People v. Byers* (1979) 90 Cal.App.3d 140, 146, fn. 1.)  This practice—"quartering" within a single assessment cycle—is not at issue here.

for, but was denied, certificates of compliance for the three lots. (*Id.* at p. 596.)

The county did not dispute that the first two parcels were "created prior to the 1893 enactment of regulations governing the subdivision of land" (i.e., prior to the first iteration of the Subdivision Map Act). (*Lakeview*, *supra*, 27 Cal.App.4th at pp. 596, 599 & fn. 2.) But it did dispute that the third parcel was "created" prior to that time. Accordingly, the Court of Appeal turned first to that issue and held the third parcel had been " 'created' when it was separated from the other units of land with which it was contiguous by the 1891 federal *patent* which conveyed title to [the] parcel" to the railroad. (*Id.* at pp. 597–598.) The court expressly distinguished between federal land patents, which are conveyances, and federal "[s]urvey [m]aps," which are not. (*Ibid.*) "Because the federal patent which conveyed [the] parcel to [the railroad] did not convey the contiguous parcels . . . , this conveyance was a 'subdivision' of land which 'created' [the] parcel . . . as a separate lot." (*Id.* at p. 598.)

The court next held the plaintiff was entitled to certificates of compliance, rejecting the county's assertion the plaintiff was required to comply with parcel map requirements. (*Lakeview*, *supra*, 27 Cal.App.4th at pp. 598–599.) In this regard, the court discussed two sections of the Act.

The first was section 66499.30, the " 'compliance' " provision, which " 'prohibits the sale, lease or financing' " of parcels unless the requirements of the Act are met for such parcels. (*Lakeview*, *supra*, 27 Cal.App.4th at p. 598; § 66499.30, subd. (a).) The statute does not apply, however " 'to any parcel or parcels of a subdivision . . . sold . . . in compliance with or *exempt from any law* (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established.' "

13

(*Lakeview,* at p. 598, italics added; § 66499.30, subd. (d).)[18]  Rejecting the county's assertion that subdivision (d) did not apply to the parcels at issue because prior to 1893 there "were no laws regulating the creation of subdivisions" from which to be exempt, the court went on to imply, but did not squarely hold, that section 66499.30, subdivision (d) excused the plaintiff from complying with parcel map requirements.[19]  (*Lakeview,* at pp. 598–599.)

The court next discussed the statute that concerns us, section 66412.6, which at the time in question extended the presumption of legality to any parcel " 'if at the time of the creation of the parcel there was compliance with any local ordinance or there was *no local ordinance in effect* which regulated divisions of land creating fewer than five parcels.' "  (*Lakeview*, *supra*, 27 Cal.App.4th at p. 599, italics added.)  The court held the fewer-than-five presumption of legality applied to the lots at issue.  "As the three parcels herein at issue were created prior to the 1893 enactment of any laws regulating the creation of subdivisions, the conclusive presumption of Government Code section 66412.6, subdivision (a) applies, and we must presume that these three parcels were 'lawfully created.' "  (*Ibid.*)

The court went on to address the county's claim that the three parcels had, in any case, " 'merged' " with "contiguous land by reason of common ownership sometime prior to [the] plaintiff's acquisition of title."  (*Lakeview,*

_____

[18]  Subdivision (d) of section 66499.30 is sometimes referred to as the "grandfather" provision of the Act.  (See, e.g., *Witt, supra,* 165 Cal.App.4th at p. 548.)  However, to avoid any confusion between this section and section 66412.6, we refer to section 66499.30, as did *Lakeview,* as the compliance provision.

[19]  As we discuss, *infra, Lakeview's* interpretation of section 66499.30, subdivision (d) was subsequently called into question in *Gardner, supra,* 29 Cal.4th at pp. 1000–1001, and in light of *Gardner,* rejected in *Witt, supra,* 165 Cal.App.4th at page 543.

14

*supra*, 27 Cal.App.4th at pp. 599–600.) With respect to this point, the court cited to section 66451.10 which then provided, " '[T]wo or more contiguous parcels or units of land which have been created under the provisions of this division, or any prior law regulating the division of land, or a local ordinance enacted pursuant thereto, or which were *not subject to* those provisions at the time of their creation, shall not be deemed merged by virtue of the fact that the contiguous parcels or units are held by the same owner. . . .' " (*Lakeview,* at p. 600, italics added, quoting § 66451.10.) " 'If, when the parcels were created, no land-division provisions were in existence, the parcels necessarily "were not subject to those provisions at the time of their creation." ' " (*Lakeview*, at p. 600, quoting *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 761 (*Morehart*).[20]) Since the "[p]laintiff's three parcels were created prior to the enactment of any land-division regulations," under "section 66451.10, common ownership of these parcels and contiguous land

---

[20] In *Morehart,* our Supreme Court held, among other things, that certain merger provisions did not apply to parcels which the county conceded were created pursuant to an antiquated subdivision map. (*Morehart, supra,* 7 Cal.4th at pp. 760–761.) Specifically, these provisions specified, in pertinent part, that common ownership of parcels did not automatically result in a merger thereof if the parcels were " 'created under the provisions of [the Act], or any prior law regulating the division of land, or a local ordinance enacted pursuant thereto, or . . . *were not subject to those provisions at the time of their creation. . . .' "* (*Id.* at p. 761.) The county read the phrase " 'not subject to those provisions at the time of their creation,' to mean 'exempted from land-division provisions that were in existence at the time of the parcels' creation.' " (*Ibid.*) The high court "disagreed with that strained interpretation" and held that "[i]f, when the parcels were created, no land-division provisions were in existence, the parcels necessarily 'were not subject to those provisions at the time of their creation.' " (*Ibid.*) Thus, the anti-merger provisions applied "to parcels created before the effective date of any applicable law regulating the division of land," including parcels created by an antiquated subdivision map or by conveyance of a lot depicted thereon. (*Id.* at p. 762.)

15

did not result in merger," and there "was no evidence of any such statement in any prior deed in the chain of title to these parcels." (*Lakeview*, at p. 600.)

Thus, as pertinent to this case, *Lakeview* construed the pivotal language of the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a)—"*no local ordinance in effect* which regulated divisions of land creating fewer than five parcels" (italics added)—as embracing *any* time period prior to 1972 when there was "no" local regulatory provision in place, including any period prior to the initial enactment of the Subdivision Map Act in 1893. (*Lakeview, supra,* 27 Cal.App.4th at p. 599.) As we have noted, this construction is consistent with the Supreme Court's decision in *Morehart* construing similar language in the Act's then applicable merger provision. *Lakeview* also acknowledged, in a rather backhanded way, that multiple, legally created lots can be conveyed in a single deed. (*Id.* at pp. 596, 600.)

Factually, however, *Lakeview* involved the converse of the scenario we are considering. In *Lakeview,* the three parcels at issue were separately created, thereafter aggregated with other properties, and then subsequently conveyed in a single deed. Here, lot 18 was conveyed several times with more than three other lots before it was conveyed in conjunction with only three other lots.

The second case discussing section 66412.6, subdivision (a) in an arguably similar context is *Fishback v. County of Ventura* (2005) 133 Cal.App.4th 896 (*Fishback*). In that case, the owner of a 140-acre parcel recorded, in 1940, a survey depicting 15 lots on the southern part of the acreage. (*Id.* at pp. 899–900.) The owner conveyed 10 of those lots, leaving it with "four" remaining parcels (what those "four" parcels encompassed is unclear from the opinion). (*Id.* at p. 900.) Several years later, the owner of

16

the remainder of the parent property conveyed some portion thereof to a grantee, who promptly divided the property he acquired into four lots. (*Ibid.*) The owner of the larger acreage subsequently conveyed two more lots from the remaining property. (*Ibid.*) Eventually, most of the initially conveyed 10 lots, the four lots created by the grantee, and the two later conveyed lots from the remainder of the parent property, ended up in a single ownership. The holder of an option on that consolidated ownership sought 12 certificates of compliance, two of which were issued. (*Ibid.*) At all relevant times, the Subdivision Map Act's mapping requirements applied to subdivisions of land into "five or more parcels within any one-year period." (*Id.* at p. 902.)

On appeal, the option holder claimed the first four lots conveyed following the survey were legally created by " 'quartering.' " (*Fishback, supra,* 133 Cal.App.4th at pp. 901–902.) The Court of Appeal rejected this theory, concluding the "10 conveyances broke up the parent parcel so as to create 14 parcels." (*Id.* at p. 902.) The subdivision had therefore resulted in " 'five or more parcels within any one year period,' " triggering the Act's mapping requirements. (*Ibid.*)

The holder alternatively argued that, at the very least, the four parcels the grantee had created from the parcel he purchased were legal under the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a). (*Fishback, supra,* 133 Cal.App.4th at p. 904.) The court also rejected this theory, stating the statute "simply clarifies that parcels legally created without a parcel map are legal even after the parcel map requirement was added to the [Subdivision Map Act]. The statute does not legalize illegally created parcels." (*Ibid.*) "Here," said the court, "the four . . . parcels [created by the grantee] resulted from the parent parcel's division into 14 parcels," which brought the original subdivision within the ambit of the

17

Subdivision Map Act, but with which there had been no compliance. (*Id.* at pp. 905–906.) The court distinguished *Lakeview* on the ground the three parcels at issue in that case had been created prior to enactment of the Act and none "resulted from an illegal division of land." (*Ibid.*)

Thus, *Fishback* did not question *Lakeview's* reading of section 66412.6, subdivision (a)—i.e., that its presumption of legality can apply to any lot created prior to 1972, including a lot created prior to the original enactment of the Subdivision Map Act or any local subdivision ordinance. Rather, *Fishback* held the presumption will not apply where the parcel from which fewer than five parcels are created was, itself, not lawfully created, as was the case in *Fishback* since the Subdivision Map Act's mapping requirements were then in effect but there had been no compliance therewith.

At this point, we turn to *Gardner, supra,* 29 Cal.4th 990, which appellant asserts did not consider the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a), but which the city continues to claim is dispositive.

The plaintiffs in *Gardner* owned approximately 158 acres of what had once been a 1,000-plus acre holding, for which an ostensible subdivision map depicting nearly 90 lots had been recorded in 1865. (*Gardner, supra,* 29 Cal.4th at p. 994.) Over the years, parts of the holding were conveyed to various parties. In 1903, 352 acres was transferred to a grantee. In 1990, the plaintiffs acquired 158 acres of that acreage. (*Id.* at p. 995.) The 158 acres included two of the lots depicted on the 1865 map and fragments of 10 of the other lots. The plaintiffs eventually applied for, and were denied, 12 certificates of compliance. (*Id.* at pp. 995–996.) The issue before the Supreme Court was whether the antiquated subdivision map (i.e., a subdivision map recorded prior to 1893), in and of itself, created "legally

18

cognizable subdivisions" of the land for purposes of the Subdivision Map Act. (*Id.* at p. 994.) The court held it did not. (*Ibid.*)

Among other provisions of the Act, the high court considered whether section 66499.30, the "compliance" provision, and specifically subdivision (d)—which, as we have recited, states the statute's prohibitions do not apply to any subdivision " 'in compliance with or *exempt* from any law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established' "—applied, thereby excusing the plaintiffs from complying with the Act's map requirements. (*Gardner, supra,* 29 Cal.4th at pp. 999–1000.) There were no state or local regulations governing subdivisions in 1865, and the plaintiffs cited to *Lakeview* in support of their assertion that the exception set forth in section 66499.30, subdivision (d) applied. Observing that *Lakeview* had concluded that the "exempt from" language of section 66499.30 (the compliance provision) and the "not subject to" language of section 66451.10 (the anti-merger provision) have "essentially the same meaning," the court did not decide the issue.[21] (*Gardner,* at p. 1000.)

Instead, even assuming the differing language of the two statutes had the same meaning, the high court held the recording of the 1865 map, in and of itself, did not "*lawfully* 'establish[]' " the subdivision for purposes of section 66499.30, subdivision (d). (*Gardner, supra,* 29 Cal.4th at p. 1000, italics added.) That was because the common law at the time the map was recorded provided that a lot depicted on map not recorded pursuant to any statute,

<hr />

[21] As we have discussed, the *Lakeview* court also viewed the "no local ordinance in effect" language of section 66412.6, subdivision (a) (the fewer-than-five presumption of legality) as akin to the "not subject to" language of section 66451.10 (the anti-merger provision) the high court had construed in *Morehart*. (*Lakeview, supra*, 27 Cal.App.4th at p. 599.)

ordinance, or regulation, "generally enjoyed no independent legal status until the owner actually conveyed the lot separately from the surrounding lands through a deed or patent." (*Id.* at p. 1001.) In short, "the recordation of a subdivision map [in the county in question] in 1865, without something more (such as a conveyance), could not and did not work a *legal* subdivision of the property." (*Id.* at p. 1002, italics added.) Because the property at issue had "remained intact under sequential owners throughout its history," the plaintiffs could not "fit their case within the decisions recognizing the establishment of subdivisions by conveyance." (*Id.* at p. 1003.)

The one comment the high court made about section 66412.6 appeared in a footnote observing that the plaintiffs had made a "passing reference" to the statute but failed to offer any analysis or argument supporting its application. Accordingly, the court refrained from addressing the provision as not being properly raised. (*Gardner, supra,* 29 Cal.4th at p. 999, fn. 6.)

The Supreme Court's holding in *Gardner*, thus, has two prongs: (1) the exception set forth in the compliance section of the Act (§ 66499.30, subd. (d)) applies, at a minimum, only to a subdivision that was *legally* created at the time; and (2) under the common law prior to the enactment of the Subdivision Map Act, the recording of a subdivision map did not, in and of itself, legally subdivide property "without something more (such as a conveyance)." (*Gardner, supra,* 29 Cal.4th at p. 1002.)

Thus, *Gardner* is not on all fours. First, the facts of *Gardner* are significantly different. Here, unlike in *Gardner,* many of the lots depicted on the Map of San Antonio, including lot 18, were conveyed to grantees, and many of those lots, as well as the infrastructure depicted on the map, were developed. Indeed, a significant part of the City of Oakland has been developed pursuant to the lot designations and improvements shown on that

20

map. Second, the high court did not consider section 66412.6. To the contrary it concluded any argument based on that statute had been waived.

*Analysis*

Appellant acknowledges that, under *Gardner*, lot 18 was not legally created merely by virtue of the 1854 filing, or the 1869 recording, of the Map of San Antonio. Rather, appellant maintains that because lot 18 was conveyed from the original holding, and specifically was conveyed with only lots 15, 16, and 17 before any local ordinance applied, the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a) applies for purposes of compliance with the Subdivision Map Act.

In support of this assertion, appellant relies on two propositions.

The first is that a single deed can convey multiple parcels. (See *Lakeview, supra,* 27 Cal.App.4th at p. 596 [three legally created lots were not merged when acquired by a single landowner and were "part of" the property as it was subsequently conveyed]; see generally 3 Miller & Starr, Cal. Real Estate (4th ed.) § 8:76 ["It is common for a parcel or parcels of land to be conveyed by a single instrument, and for the legal description of the property conveyed to be made up of a series of separate descriptions."].) And, indeed, very early cases reflect that this was a recognized practice at the time in question. (See, e.g., *City of Yuba City v. Consolidated Mausoleum Syndicate* (1929) 207 Cal. 587, 588–589 (*Yuba City*) [1893 deed conveyed " 'Lots 4, 5, 6, 7, and 8, according to a Map entitled "Plot of the South half of Lot Eight in the Teegarden Addition to Yuba City" filed for record November 23rd, 1892, in the office of the recorder of said Sutter County, in Book One of Maps, page 7' "]; *Martin v. Holm* (1925) 197 Cal. 733, 738, 740–741, 748 (*Martin*)[22] [1904

_____

[22] Disapproved on another ground in *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 360, 366.

21

deed conveyed "lots 16 and 17 of the tract" that had been subdivided into 53 lots; after many of the tract lots were conveyed to various grantees, a 1910 deed from the original subdivider to his wife conveyed "lots 9, 10, and 11 of the Western Heights tract"]; *McCullough v. Olds* (1895) 108 Cal. 529, 530–532 (*McCullough*) [1858 deed granted " 'lots number three (3) and four (4)' " depicted by "lines dividing" survey made by a surveyor based on the "official map of San Diego"].)

The second is that a deed can sufficiently describe the property conveyed by referencing the map (including an antiquated map) that depicts it and that a metes and bounds description is not required. (*McCullough, supra,* 108 Cal. at p. 532 ["it is a familiar rule that when a tract of land has been subdivided into blocks or lots, and a map thereof made on which the blocks or lots are designated by numbers, a description of the blocks or lots in a deed by the numbers so designated is sufficient, provided the map can be produced and identified"]; see generally 3 Miller & Starr, Cal. Real Estate (4th ed.) § 8:64 ["if the deed references the map and is sufficiently precise in describing the portion of the property in the map or survey that is conveyed, the description is adequate and the deed is valid, whether or not the map is recorded"].) Again, this practice is reflected in very early cases. (E.g., *Yuba City, supra,* 207 Cal. at pp. 588–589; *Martin, supra,* 197 Cal. at pp. 741–742; *McCullough, supra,* 108 Cal. at pp. 530–531.)

Given the propositions on which appellant relies, we asked the parties to submit supplemental briefing on whether it could be said that lot 18 was created prior to 1885, i.e., when it was conveyed several times in conjunction with lots 10 through 17.[23] Appellant candidly acknowledged this would be so.

---

[23] As we have recited, many other separately identified lots depicted on the San Antonio Map were also conveyed by way of these early conveyances.

22

But it pointed out it is not relying on those early conveyances because, as it also candidly acknowledged, those conveyances were not of fewer-than-five lots and thus section 66412.6, subdivision (a)'s presumption of legality for Subdivision Map Act purposes would not apply. Appellant maintained, however, that the fact the earliest conveyances do not come within the Map Act presumption is immaterial since each conveyance was lawful at the time and the subsequent conveyances of only lots 15, 16, 17 and 18 squarely come within the presumption.

The city reiterated its view that *Gardner* controls and because lot 18 was never separately conveyed as a single lot, it was never "lawfully 'established' " as a subdivided lot (*Gardner, supra,* 29 Cal.4th at p. 1000) and therefore the fewer-than-five presumption set forth in section 66412.6, subdivision (a) cannot apply. Given the city's argument, we asked counsel at oral argument whether it is the city's position the *only* conveyance that can *ever* effectuate a lawful subdivision under *Gardner* is a conveyance of only a single lot. Counsel declined to concede the point, stating there might be some set of extraordinary circumstances where a single conveyance could, under *Gardner*, lawfully create more than one lot. However, counsel acknowledged that in the case at hand it is the city's view that lot 18 had to be "separately" and individually conveyed to "work a *legal* subdivision of the property." (*Id.* at p. 1002, italics added.) Indeed, the city's respondent's brief is replete with assertions that "*Gardner* requires lots shown on a pre-1893 map to be separately conveyed." It likewise asserted in its supplemental letter brief that the "holding in *Gardner* is directly on point" and no lot depicted on an antiquated map can be "formally 'created' unless it is conveyed *separately from* the surrounding lands."

23

On close examination of *Gardner*, we conclude the city has read the case to impose a single-lot-only constraint on conveyances that the high court did not, in fact, impose.  As we have recited, the facts of *Gardner* are markedly different from those here, and the court was not called on to consider, nor did it consider, the question of conveyances of multiple, separately identified lots, let alone in a context where many of the lots and the infrastructure depicted on the subdivision map were developed.  The city has also overlooked the high court's recitation of the findings by the local board of supervisors that provided the factual predicate for the court's decision.  The local board of supervisors found: "(1) plaintiffs' property had been 'repeatedly and consistently conveyed as a single unit of land' since 1865 and 'generally described in metes and bounds since 1903'; and (2) none of plaintiffs' 12 purported lots had ever been separately conveyed *or separately described in a grant deed.*"  (*Gardner, supra,* 29 Cal.4th at p. 996, italics added.)

Here, appellant's lots *were* "separately described" in *every* conveyance of fewer than five lots.  And, as we have discussed, this was wholly consistent with the law then, and now, that multiple, separately described lots can be transferred by way of a single conveyance, such as a grant deed.  (E.g., *Yuba City, supra,* 207 Cal. at p. 588 [1893 deed conveyed multiple, separately identified lots]; *Martin, supra,* 197 Cal. at pp. 738, 740–741, 748 [1904 and 1910 deeds conveyed multiple, separately identified lots]; *McCullough, supra,* 108 Cal. at pp. 530–532 [1858 deed conveyed multiple, separately identified lots].)  Indeed, in not one of these early cases did the Supreme Court remotely suggest the properties in question had not been legally subdivided because

24

the separately identified lots, as depicted on a subdivision map, had been conveyed in a single deed.[24]

Accordingly, the city's insistence that *Gardner* is dispositive does not hold sway.

We also conclude the fact lot 18 was initially conveyed with eight other lots does not preclude the fewer-than-five presumption from applying upon its being conveyed with only lots 15, 16, and 17. The parties agree that prior to 1939 there were no state or local regulatory controls applicable to subdivisions resulting in fewer than five lots. Thus, in this regard, to quote *Witt,* "[l]andowners were free to subdivide and sell their real property as they saw fit." (*Witt, supra,* 165 Cal.App.4th at p. 552.)

The ability of owners to use their property as they wanted, including dividing their property into smaller lots, is also reflected by cases decided during that early time period. As a general matter these cases established that the grantees of lots depicted on a subdivision map could be restricted in their use and transfer of the property only in limited circumstances, e.g., where the deeds transferring all, or nearly all, of the lots shown on the map contained restrictions for the benefit of the other grantees. (See, e.g., *McBride v. Freeman* (1923) 191 Cal. 152, 153–154, 158–160 [although deeds conveying "a large number of lots" depicted on subdivision map contained use restrictions, these restrictions could not, under the rule of *Werner v. Graham,* be enforced by and against subsequent grantees]; *Werner v. Graham* (1919) 181 Cal. 174, 177, 181, 184–185 [although 1905 deeds conveying 116 of 132 lots shown on tract map restricted uses, deed conveying another one of the

_____

[24] These cases also refute the city's assertion in its supplemental brief that lot 18 was never " 'separately describe[d],' " because it "always appears as part of a reference to a group of lots on the 1854 Map."

25

lots did not and grantee's use of that property was not restricted];
*Farquharson v. Scoble* (1918) 38 Cal.App. 680, 682 [rejecting claim that
where "the owner of a tract of land has laid it out and offered it for sale under
general plan, he has no right to change or modify such plan, either by
subdivision of the tract into smaller lots than originally laid out, or by
releasing the unsold portion from restrictive covenants imposed on the sold
portion"].)

Accordingly, that commencing in 1885 grantors *chose* to convey the
property as four separately identified lots, rather than, for example, a single
lot described by a general metes and bounds description, had, *at the time*,
legal significance.

Moreover, no case, early or recent, holds the fewer-than-five
presumption of legality set forth in section 66412.6, subdivision (a) cannot
apply in the particular circumstances presented by this case. While
*Fishback,* on first reading, may appear to bear some similarity to the case at
hand, in fact, its differences are significant. As we have discussed, in that
case a 1940 survey purportedly subdivided the parent property into a number
of parcels, 10 of which were conveyed, breaking "up the parent parcel so as to
create 14 parcels, including four parcels left in possession of" the original
owner. (*Fishback, supra,* 133 Cal.App.4th at p. 902.) Thus, the court stated
the question before it as follows: "What is a legal subdivision according to the
Subdivision Map Act (SMA) as it existed in the 1930's and 1940's." (*Id.* at
p. 899.) That, of course, is not remotely the question before us. As the court
went on to explain, in 1940 the Subdivision Map Act's mapping requirements
applied to subdivisions of five or more parcels and therefore applied to the
subdivision of the parent parcel into 14 parcels. (*Id.* at p. 902.) Since the
owner had not complied with the Act, the parcels were illegal. (*Ibid.*) The

26

court went on to hold that these illegal parcels could not, in turn, be subdivided into fewer than five parcels and thereby yield presumptively legal parcels under section 66412.6. (*Fishback,* at pp. 904–905.)

Here, in contrast, lot 18 does not have its genesis in an illegal subdivision. The city insists to the contrary, citing to *Gardner.* But, as we have discussed, *Gardner* does not impose the one-lot-only constraint on conveying subdivided property the city claims it does. Not only did the high court address a different set of facts, but such a reading of *Gardner* is at odds with the board findings underpinning the court's analysis. It also cannot be squared with decisions of the high court during the time period relevant here that, unlike *Gardner,* did involve deeds conveying multiple, separately identified lots depicted on a subdivision map and do not remotely suggest the lots were not "legally" created.

The city also maintains that applying the fewer-than-five presumption of legality set forth in section 66412.6, subdivision (a) to the circumstances here would "render this provision in direct conflict with" the exception to the compliance provision set forth in section 66499.30, subdivision (d). This assertion is answered by *Fishback* and *Lakeview*—both of which separately discussed the two sections without any intimation that, despite their differing language, the two provisions must be read in lockstep, i.e., as essentially redundant, to avoid a purported conflict.[25] (*Fishback, supra,* 133 Cal.App.4th

---

[25] We note, for example, that the compliance provisions of section 66499.30 "do not apply to *any* parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased *in compliance with* or *exempt from any* law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established." (§ 66499.30, subdivision (d), italics added.) The fewer-than-five-presumption is much more limited in scope and states, "any parcel *created prior to March 4, 1972*, shall be conclusively presumed to have been

27

at pp. 901–902 [discussing section 66499.30, subdivision (d)], *id.* at pp. 904–905 [discussing section 66412.6, subdivision (a)]; *Lakeview, supra*, 27 Cal.App.4th at p. 598 [discussing section 66499.30, subdivision (d)], *id.* at p. 599 [discussing section 66412.6, subdivision (a)].)  In short, we discern no "conflict" in our conclusion that lot 18 is presumptively lawful under section 66412.6, subdivision (a) and the exception to the compliance provision set forth in section 66499.30, subdivision (d).

## DISPOSITION

The judgment is REVERSED with directions to grant the petition for writ of mandate and issue an appropriate writ requiring the city to issue a certificate of compliance for lot 18.  Appellant to recover costs on appeal.

---

lawfully created if the parcel resulted in a division of land in which *fewer than five parcels* were created and[,] if at the time of the creation of the parcel, there was *no local ordinance* in effect which regulated divisions of land creating fewer than five parcels." (§ 66412.6, subdivision (a), italics added.)

28

_____

Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Swope, J.*


**Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A162465, Crescent Trust v. City of Oakland

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CRESCENT TRUST,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>    Defendant and Respondent. | A162465<br><br>  (Alameda County<br>  Super. Ct. No.<br>RG20068131)<br><br>  ORDER<br>  CERTIFYING<br>  OPINION FOR<br>  PUBLICATION<br><br>  [NO CHANGE IN<br>  JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on March 23, 2023, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated: _____

                                                    Acting P. J.

1

Trial Court: Alameda County Superior Court

Trial Judge:        Hon. Paul Herbert

Counsel:

Chandler & Shechet, LLP, Nathan Aaron Shechet and Anne Leigh Chandler for Plaintiff and Appellant.


Jarvis, Fay & Gibson, LLP, Christine Crowl and Rick Jarvisl; Oakland City Attorney's Office, Patrick Brian Mulry, Barbara Parker and Maria Bee for Defendant and Respondent.